IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 16-03024-01-CR-S-MDH |
| | ) | |
| Plaintiff, | ) | Springfield, Missouri |
| | ) | February 23, 2016 |
| v. | ) | |
| | ) | |
| SAFYA ROE YASSIN, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF HEARING ON INITIAL APPEARANCE, ARRAIGNMENT,
DETENTION AND SCHEDULING CONFERENCE
BEFORE THE HONORABLE DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Abram McGull, II, Esq.
                            Assistant United States Attorney
                            901 St. Louis St., Ste. 500
                            Springfield, MO  65806
                            (417) 831-4406

For the Defendant:          Ian A. Lewis, Esq.
                            Federal Public Defender's Off.
                            901 St. Louis St., Ste. 801
                            Springfield, MO  65806
                            (417) 873-9022

Court Audio Operator:       Mr. Steve Burch

Transcribed by:             Rapid Transcript
                            Lissa C. Whittaker
                            1001 West 65th Street
                            Kansas City, MO  64113
                            (816) 914-3613

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1    (Court in Session at 2:57 p.m.)

2    THE COURT: -- scheduling conference in regard to the

3 Indictment and then also take up the issue of detention.  Any

4 objection?

5    MR. LEWIS:  No objection, Your Honor.

6    MR. McGULL:  No objection.

7    THE COURT:  Mr. Lewis, on behalf of the defendant then

8 as we proceed to the initial appearance and arraignment and

9 scheduling conference, have you received a copy of the Indictment

10 in this case?

11    MR. LEWIS:  We have, Your Honor.  We would waive formal

12 reading, enter pleas of not guilty.

13    THE COURT:  Thank you.  A plea of not guilty is entered

14 on behalf of the defendant.  On her behalf will you voluntarily

15 disclose all *Jencks* Act material at least 14 days prior to trial?

16    MR. LEWIS:  Yes, Your Honor.

17    THE COURT:  And are you asking for all discovery to

18 which your client is entitled?

19    MR. LEWIS:  I am, Your Honor.

20    THE COURT:  Mr. McGull, on behalf of the United States,

21 will you also voluntarily disclose all *Jencks* Act material at

22 least 14 days prior to trial?

23    MR. McGULL:  Yes, Your Honor.

24    THE COURT:  And are you asking for all discovery to

25 which the United States is entitled?

1          MR. McGULL:  That is correct, Your Honor.

2          THE COURT:  I will enter a scheduling order and place

3     this matter on the joint criminal trial docket.  The additional

4     issue before the Court this afternoon is the defendant's custody

5     status.  In that regard, the Court would note that the United

6     States has filed a written Motion for Detention and the Court

7     would also note -- and that is Document 13.  And the Court would

8     also note that defense counsel has filed a response to the

9     Government's written Motion for Detention.  The Court will also

10    take note of its own file, which includes the Indictment that was

11    returned in this case, as well as the report of the Pretrial

12    Services Officer, a copy of which has been provided to both

13    counsel.  Also with regard to the issue of detention, the Court

14    will also take note of the affidavit that was filed in support of

15    the criminal complaint.  The Court notes that FBI Special Agent

16    Stacie Lane, who was the affiant in the complaint, is present in

17    the courtroom for these proceedings.  I would want to point out

18    to both counsel and I'll refer to the Pretrial Services Officer,

19    but in regard to the incident on page 4, dated April 8, 2001, in

20    San Bernardino, I believe that there has been some clarification,

21    Ms. Smith.  I don't know if you can advise the Court as to the

22    status on those four charges, indicated that they were unknown.

23    Can you update the Court in regard to those charges?

24          MS. SMITH:  Yes, Your Honor.  Following the filing of

25    this report, I received a copy of the records check from the

1   State of California which indicates that on all four counts she

2   was convicted and sentenced to 210 days custody and 60 months

3   probation.

4           THE COURT:  All right.  And I want both parties to be

5   aware that that is -- there has not been an addendum to the

6   Pretrial Services Report.  Mr. McGull, with that before the

7   Court, does the United States have any additional evidence that

8   you want to put on by way of witness or proffer?  And of course,

9   I'll entertain any argument you'd like to make on the issue of

10  detention.

11          MR. McGULL:  Sure, Your Honor, we would.  The Government

12  would like to call Ms. Stacie Lane.

13          THE COURT:  All right.

14          STACIE LANE, GOVERNMENT'S WITNESS, SWORN

15          MR. McGULL:  There's one other matter while the witness

16  is taking the witness stand that I'll bring to the Court's

17  attention.  We noticed that after the Indictment came out that

18  District Court Judge Roseann Ketchmark had been assigned this

19  particular case.  And we have filed -- after learning that

20  information, we have filed a motion with the court requesting a

21  new judge because we do believe there may be a conflict with her

22  being on this case.  I just want to bring that to the Court's

23  attention as well the defense.

24          THE COURT:  All right.  Thank you, Mr. McGull.

25          MR. McGULL:  Sure.

1                      DIRECT EXAMINATION

2   BY MR. McGULL:

3   Q.   Ma'am, could you state you name, please?

4   A.   Special Agent Stacie Lane.

5   Q.   And where are you employed?

6   A.   The Federal Bureau of Investigation, Kansas City, Missouri.

7   Q.   And how long have you been employed as a Federal Bureau of

8   Investigation Special Agent?

9   A.   Thirteen years.

10  Q.   Okay.  And what are your duties with the FBI?

11  A.   Currently I'm assigned to an international terrorism squad.

12  Q.   Were you also involved in the investigation of the defendant

13  who is here in this courtroom today?

14  A.   Yes, sir.

15  Q.   Okay.  And when did that investigation begin?

16  A.   Approximately January of 2015.

17  Q.   And can you tell the Court, what was the nature of this

18  investigation?

19  A.   The nature of the investigation was terroristic threats via

20  communication.

21  Q.   And were these terrorist threats made over the Internet?

22  A.   That is correct.

23  Q.   Okay.  Now, as part of your investigation what exactly did

24  you do as well as others within the FBI?

25  A.   We began monitoring the defendant's open source Twitter and

1  Facebook posts.  In addition, we interviewed folks and we

2  conducted surveillance and received -- served legal process to

3  various companies.

4  Q.  Okay.  Can you move a little closer to that, please?  And was

5  there anything unusual about the defendant's Internet posting?

6  A.  They just seemed to indicate more and more violent rhetoric

7  as time increased.

8  Q.  Okay.  All right.  And as part of your investigation, did you

9  capture some of those Internet postings that was made by the

10  defendant?

11  A.  Yes, sir, we did.

12  Q.  Okay.  And was there a particular handle or a name that she

13  used -- the defendant used to post things on the Internet?

14  A.  Yes, sir.  It was observed and she also stated during an

15  interview that she often used Muslimah as her handle on Twitter.

16         MR. McGULL:  Your Honor, may I approach the witness?

17         THE COURT:  You certainly may.

18  BY MR. McGULL:

19  Q.  I hand you what's been marked for identification purposes as

20  Government Exhibit #1.  Do you recognize that document I've just

21  handed you?

22  A.  I do, sir.

23  Q.  And can you tell me how you are able to recognize that

24  document?

25  A.  It's one of the open source Twitter posts that we captured.

1  Q.  Okay.  And was this Twitter post made by the defendant?

2  A.  Yes, sir.  It has the name that she admitted using and we

3  observed her using Muslimah.  And she also stated to us and we

4  observed that she uses the green Twitter bird most often.

5  Q.  Is there anything significant about this post?  And what was

6  the date on that particular post, by the way?

7  A.  The date on the post is July 13th of 2015.

8  Q.  And can you tell the Court is there anything significant

9  about that post?

10  A.  That capture is a Tweet by her that states, quote, "What was

11  taken by force must be taken back by force, not protest signs and

12  boycotting."

13          MR. McGULL:  Your Honor, we move to admit Exhibit #1.

14          THE COURT:  Any objection?

15          MR. LEWIS:  No objection for purposes of this hearing,

16  Your Honor.

17          THE COURT:  All right.  Government's Exhibit #1 will be

18  admitted without objection for the limited purpose of this

19  hearing only.

20  BY MR. McGULL:

21  Q.  And in your investigation did you continue to monitor the

22  posting by -- the postings made by the defendant?

23  A.  Yes, we did.

24  Q.  And did she make a post on August 12, 2015?

25  A.  Yes, she did.

1  Q.  Okay.  I'll show you what's been marked for identification

2  purposes of Exhibit #2.  Do you recognize that document I just

3  handed you?

4  A.  I do, sir.

5  Q.  And how is it you're able to recognize that document?

6  A.  Again, this is one of the open source Twitter posts that we

7  captured.

8  Q.  And a Twitter post by the defendant?

9  A.  Using -- yes, sir, using the handle Musila -- Muslimah --

10  excuse me -- and the green Twitter bird.

11        MR. McGULL:  At this time the Government would move to

12  admit exhibit -- Government Exhibit #2 for purposes of this

13  hearing.

14        THE COURT:  Any objection?

15        MR. LEWIS:  No objection for the purposes of this

16  hearing, Your Honor.

17        THE COURT:  Again, Government's Exhibit #2 will be

18  admitted without objection for the limited purpose of this

19  hearing only.

20  BY MR. LEWIS:

21  Q.  Can you tell the Court exactly what did the defendant post on

22  the Internet on August 12, 2015?

23  A.  In response to another user's stating that she might get

24  raided, she stated, quote, "Anyone raiding me will be shot on

25  site."

1  Q.  Okay.  And that's the post made by the defendant?

2  A.  That is correct.

3  Q.  Okay.  Did you continue monitoring the defendant's Internet

4  activity after that date?

5  A.  Yes, sir, we did.

6  Q.  Okay.  I show you what's been marked for identification

7  purposes Government's Exhibit #3.  Do you recognize that document

8  I've just handed you?

9  A.  Yes, sir, I do.

10  Q.  And how is it you're able to recognize that document?

11  A.  Again, this is carrying the Muslimah handle.

12  Q.  Okay.  And it was also one of the points that you captured in

13  your investigation of the defendant, is that correct?

14  A.  That is correct.

15         MR. McGULL:  Okay.  At this time, Your Honor, I'd like

16  to move to admit Exhibit #3.

17         THE COURT:  Any objection?

18         MR. LEWIS:  No objection for the purposes of this

19  hearing, Your Honor.

20         MR. McGULL:  Okay.

21         THE COURT:  Government's Exhibit #3 will be admitted

22  without objection for the limited purpose of this hearing only.

23  BY MR. McGULL:

24  Q.  Could you tell the Court what did the defendant publish on

25  December 1st, 2015, using her Twitter handle?

1  A.  "Doesn't matter if all you have is a rock.  If you go forth

2  in the cause of Allah, he will support you.  It's a victory or

3  martyrdom."

4  Q.  Okay.  And after December 1st, did you and others involved in

5  this investigation continue to monitor the defendant's public

6  postings?

7  A.  Yes, we did.

8  Q.  Okay.  I'll show you what's been marked for identification

9  purposes of Government's Exhibit #4.  Do you recognize that

10  document?

11  A.  I do, sir.  Again, it's a post that we captured of the

12  defendant's account in open source.

13  Q.  Okay.  And it was also captured as part of your investigation

14  in this case of the defendant, is that correct?

15  A.  Yes, sir.

16       MR. McGULL:  The Government would move to admit

17  Government Exhibit #4, Your Honor.

18       THE COURT:  Any objection?

19       MR. LEWIS:  No objection for the purposes of this

20  hearing, Your Honor.

21       THE COURT:  Government's Exhibit #4 will be admitted for

22  the purposes -- without objection for the purposes of this

23  hearing only.

24  BY MR. McGULL:

25  Q.  So, on December 4, 2015, what did the defendant post to the

1  Internet on that particular day?

2  A.  "A righteous and noble wife is the one who encourages her

3  husband to Jihad and encourages him to race her to Jannah."

4  Q.  Okay.  Now, what does that particularly mean to you as an

5  investigator in terrorist cases in terms of Jihad?  What does

6  Jihad mean?

7  A.  We understand Jihad to mean holy war.  So, in essence, it's

8  stating that -- it's encouraging holy war and that's how you

9  reach heaven.

10 Q.  Okay.  Now, subsequent to the monitoring of the defendant's

11 Internet postings, on February 18, you and others -- other

12 members of the FBI also conducted an arrest of the defendant, is

13 that correct?

14 A.  That is correct.

15 Q.  And on that arrest they also executed on a search warrant, is

16 that correct?

17 A.  Yes, sir.

18 Q.  And that search warrant included the defendant's phone, is

19 that correct?

20 A.  Yes.

21 Q.  Okay.  I'll show you what's marked as Government's Exhibit #5

22 and ask you do you recognize that document I just handed you?

23 A.  I do.

24 Q.  How is it you're able to recognize that document?

25 A.  This is a telegram conversation we obtained from the

1  defendant's seized cell phone on February 18th.

2  Q.  Okay.  Was that pursuant to a search warrant executed on

3  February 18?

4  A.  That is correct.

5         MR. McGULL:  Okay.  At this time, Your Honor, the

6  Government would move to admit Exhibit #5.

7         THE COURT:  Any objection?

8         MR. LEWIS:  I do object to this one, Your Honor.

9         THE COURT:  And the basis of the objection?

10        MR. LEWIS:  Your Honor, I believe that it is going into

11 a cell phone, extracting this type of metadata without laying the

12 proper foundation, first, with a computer forensics specialist I

13 don't think is proper at this time.

14        MR. McGULL:  Your Honor, in response to the defense,

15 this is a detention hearing, a pretrial detention hearing.  And

16 according to the Federal Rule 1101(d)(3), the Rules of Evidence

17 really doesn't apply.

18        THE COURT:  Well, if you can lay just a little further

19 foundation as to, you know, how this document was obtained.  And

20 I understand that the rules are more relaxed for a detention

21 hearing, but I think that you can lay further foundation.

22        MR. McGULL:  Sure, Your Honor.

23 BY MR. McGULL:

24 Q.  Exhibit #5, how was that obtained?

25 A.  Upon the cell phone being seized it was analyzed by the FBI's

1  Computer Analysis Response Team and also with other members of

2  our Regional Computer Forensics Laboratory, which are all

3  certified forensic examiners.

4  Q.  Okay.  All right.  And was that done on February 18, 2016?

5  A.  It was seized on that date and analyzed on that date.  I'm

6  not sure at which time this specific telegram chat was

7  discovered, but on or about the 18th.

8  Q.  Okay.  And did they use all the proper equipment necessary to

9  extract information from her cell phone?

10 A.  To my knowledge, yes, sir.

11        MR. McGULL:  Okay.  At this time, Your Honor, the

12 Government would move again to admit Exhibit #5.

13        THE COURT:  Same objection?

14        MR. LEWIS:  Same objection, Your Honor.

15        THE COURT:  I'm going to overrule the objection and will

16 allow admission of Government's Exhibit #5 for the limited

17 purpose of this hearing only.

18 BY MR. McGULL:

19 Q.  Did you have an opportunity to look over Exhibit #5 prior to

20 coming to court here today?

21 A.  I did.

22 Q.  Can you explain to the Judge what exactly is Exhibit #5?

23 A.  It's a telegram chat between the defendant and another party.

24 Q.  Okay.  And could you read that telegram chat between the

25 defendant and another party?

A.  From the defendant Yassin, "Yeah.  If I'm in the news it will
be because I'm dead or severely injured."  The associate, "You're
in a better situation than mine though.  You have a G.  Don't.
So, for me, it would be the sad outcome of ..."  Yassin, "They're
pretty much everywhere in USA.  I can go to flea market tomorrow
and buy one.  LOL."  Associate, "I can't believe that."

Q.  Let me stop you right there for a moment.  You mentioned "You
have a G."  As your -- as part of your investigation did you come
to the conclusion of what they are referring to in terms of a
"G"?

A.  Yes.  They're referencing a gun.

Q.  Okay.

        MR. LEWIS:  Objection, Your Honor.  I move to strike.  I
mean that's highly speculative at this point in the case.

        THE COURT:  Yeah.  Again, I think you're going to have
to lay more foundation for that, Mr. McGull, so I'm going to
sustain the objection at this time.

        MR. McGULL:  Okay.

BY MR. McGULL:

Q.  Could you continue on with reading the exhibit?

A.  Again, the Associate states, "I can't believe that."  Yassin
responds, "No background checks."  Associate, "You're in a Muslim
haven.  That is what Muslims wish for.  Not Murtadeen, G
everywhere."  Yassin, "And all these men here and very little
attacked."  Associate, "Kuffar everywhere, perfect mix."  Yassin,

1  "I met Muslim men everywhere and hardly any attacks."  Associate,

2  "Unfortunately, yeah."  Yassin, "It makes me so sick.  Like get

3  off Twitter and do something.  My posts are directed at men and

4  Jihad a lot."  Associate, "I know.  So sad."  It has the

5  abbreviation for "especially" and then "US" in capital letters.

6  Yassin, "Trying to incite."  Associate, "Number one enemy."

7  Yassin, "Yes."  Associate, "NG everywhere.  Come on.  So, many

8  bars."  Yassin, "LOL.  That's how I feel.  It's ridiculous."

9  Associate, "So many gay parades, so many Jews."  Yassin, "I have

10  thought of many things and places.  LOL."  Associate, "So many

11  police and vets."  Yassin, "I have toured many too."  Associate,

12  "Hee, hee, hee."  Yassin, "I know every synagogue where I live

13  and most cities.  LOL."  Associate, "You'd be called the

14  ringleader.  LOL O."  Yassin, "LOL."

15  Q.  Thank you.

16                      (Off Record Talking)

17          THE COURT:  Has defense counsel received copies of these

18  exhibits?

19          MR. LEWIS:  I have, Your Honor.  Thank you.

20          MR. McGULL:  Yes.

21          THE COURT:  All right.  Thank you.

22  BY MR. McGULL:

23  Q.  Now, subsequent to monitoring and executing a search warrant,

24  in fact, the search warrant was executed on February 18, is that

25  correct?

1  A.  Yes, it is.

2  Q.  Okay.  And as a part of that execution of that search warrant

3  there was an arrest warrant for the defendant as well, is that

4  correct?

5  A.  That is correct.

6  Q.  And when FBI responded to the defendant's residence, what

7  happened on that particular day?  Can you tell the Court what

8  happened?

9  A.  When they entered the residence, Yassin's son said that she

10  was in the basement.  The agents went to the basement, could not

11  see her and called out her name.  They heard her say, "I have a

12  knife."  They called her name and told her to I believe raise her

13  hands or show her hands.  And initially they saw that she was on

14  her bed, her hands were hidden.  She didn't move.  After a short

15  period of time she ended up complying, raising her hands and

16  walking towards the agents where she was restrained.

17  Q.  And you said earlier in your testimony she yelled out she has

18  a knife, is that correct?

19  A.  That is correct.

20  Q.  Did the officers find a knife?

21  A.  They did.  On the bed where she was sitting there was a knife

22  found.

23         MR. McGULL:  Okay.  Excuse me a minute.  That's all the

24  questions I have of this witness, Your Honor.

25         THE COURT:  All right.  Cross-examination.

1          MR. LEWIS:  Thank you, Your Honor.  May it please the

2    Court?

3          THE COURT:  You may proceed?

4          MR. LEWIS:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. LEWIS:

7    Q.  Good afternoon, Special Agent Lane.

8    A.  Good afternoon, sir.

9    Q.  My name is Ian Lewis.  I'm an attorney here with the Federal

10   Public Defender's Office.  I wanted to go over -- you said in

11   your testimony today that you had been surveilling the defendant?

12   A.  Yes, sir.

13   Q.  Is that through video surveillance?

14   A.  Several types of surveillance, sir.  Not constantly but

15   through different periods of time.  I believe most often physical

16   surveillance.

17   Q.  Okay.  Now, was this of her home?

18   A.  Yes, sir.

19   Q.  Did you surveil anywhere else?

20   A.  If she left the residence and we were doing surveillance, we

21   would follow her to where she went and follow her home as well.

22   Q.  Okay.  At any time did you ever see her meeting with

23   suspected terrorists?

24   A.  No, sir.

25   Q.  Did you perform any Title 3 wiretaps?

1   A.   No, sir.

2   Q.   Did you put a surveillance on her bank accounts?

3   A.   No, sir.

4   Q.   I want to go over this Government's Exhibit #2.  I'm handing

5   you that.  And you remember it, right?

6   A.   Yes, sir.

7   Q.   Okay.  Actually, I'm just going to keep it for right now.

8   Sorry.  Now, I'm also reading the complaint that you've written.

9   This is your complaint, right?

10  A.   Yes, sir.

11  Q.   All right.  Good.  Now, in this complaint you reference this

12  August 12th tweet.  And at the -- this was -- it says "The FBI

13  employee who observed this posting," this tweet about -- what did

14  it say this about raiding?  What did it say again?

15  A.   Yes, sir.  Someone is talking about someone might raid the

16  defendant to which the response was "anyone raiding me will be

17  shot on site."

18  Q.   Now, was that tweet, I guess, was that taken down?

19  A.   I don't know, sir.

20  Q.   Okay.  I'm going to hand you your complaint.  Court's

21  Document 1, page 13, here at the underline portion of Paragraph

22  30.

23  A.   It does appear that this tweet indicates -- it indicates in

24  the complaint it was likely removed from the feed by the user.

25  Q.   And that date is the day after, correct?

1  A.  Yes, sir.

2  Q.  All right.  Thank you very much.  Okay.  May I -- there's a

3  question I have to ask.  Now, this Indictment references a threat

4  made in -- allegedly made in August of last year.  But you had

5  her under surveillance since June of last year, is that correct?

6  A.  I'm not sure of the exact date that we started surveillance,

7  but that sounds about right, sir.

8  Q.  Okay.  In your complaint it stated that the almost roughly

9  daily surveillance began after this conversation with the

10  complainant which would have been the summer of last year about

11  June.

12  A.  Yes, sir.

13  Q.  Okay.  Is there any reason we are not having this hearing

14  back in October or September of last year as opposed to having it

15  now in February?  What has transpired between August as to now?

16  A.  I'm not clear on the question, sir.

17  Q.  Okay.  I understand.  In this case here and now we're trying

18  to decide whether or not she's a danger.  And if her threatening

19  conduct was dangerous back in August, wouldn't it have been

20  dangerous this entire time?

21  A.  I suppose the answer is yes.

22  Q.  Okay.  Since that August tweet were there any other specific

23  threats against individuals?

24  A.  I do not believe so.

25  Q.  Do you know if someone is currently still using her Twitter

1  account?

2  A.  I'm not aware of that, sir.

3  Q.  Okay.  I've no more questions.  Thank you very much for your

4  time.

5            THE COURT:  Any redirect?

6            MR. McGULL:  Just a few, Your Honor.

7                      REDIRECT EXAMINATION

8  BY MR. McGULL:

9  Q.  You were asked a couple of the questions by the defense

10  attorney about her being -- you were asked whether or not she was

11  under surveillance sometime during the summer, is that correct?

12  A.  That's correct.

13  Q.  Okay.  So, if she was under surveillance, so you had constant

14  monitoring of her movements and activities, is that correct?

15  A.  That is correct.

16  Q.  So, if there was ever a danger involved, you and other agents

17  of the FBI would be able to respond, is that correct?

18  A.  That is correct.

19  Q.  Okay.  All right.  Now, after you were asked a question if

20  there was any threatening communications after, I believe, June

21  or July of 2015, there was one, isn't that correct?

22  A.  The threats were in August.

23  Q.  Yeah.

24  A.  Yes.

25  Q.  On or about August 24, --

1  A.   Yes.

2  Q.   -- 2015?

3  A.   Yes.

4  Q.   What were those threats?

5  A.   There were two wanted to kill postings on federal employees

6  that listed their name and information on Twitter.

7          MR. McGULL:  Okay.  All right.  That's all the questions

8  I have, Your Honor.

9          THE COURT:  Any recross?

10         MR. LEWIS:  Quickly, Your Honor.  Thank you.

11                       RECROSS EXAMINATION

12 BY MR. LEWIS:

13 Q.   All right.  Did you apply for the search warrant on the day

14 of the arrest -- for the day of the arrest?

15 A.   Yes, I did.

16 Q.   Okay.  Was that a no-knock warrant?

17 A.   I don't believe it was.

18 Q.   Okay.  If someone comes --

19 A.   Actually, you know what?  I'm not sure.  In answer to your

20 question, let me rephrase.  I do not know.

21 Q.   Okay.  Was any -- was a battering ram used at the front door?

22 A.   I was not on scene, sir, so I can't answer that question.

23 Q.   Okay.  But you're the one who --

24         MR. McGULL:  I'm going to object to the line of

25 questioning.  I think -- I don't think it's relevant.

1    MR. LEWIS:  I think it is, Your Honor, to -- if this

2  warrant was served in a no-knock manner, that would show some

3  sort of dangerousness that would be posed by the defendant.

4    THE COURT:  I think it's relevant and I'm going to allow

5  defense counsel to make further inquiry.  If the witness doesn't

6  know the answer to the question, she can indicate she doesn't

7  know.  But I think it's a proper inquiry.

8    MR. LEWIS:  Okay.  Thank you, Your Honor.

9    THE WITNESS:  I apologize.  I actually do recall that

10 there was -- I believe the door was damaged or destroyed.

11   MR. LEWIS:  Okay.

12   THE WITNESS:  So, likely a battering ram was used or

13 some object was used.

14   MR. LEWIS:  Okay.

15 BY MR. LEWIS:

16 Q.  Was anyone injured during this arrest?

17 A.  I believe the defendant's son had a -- maybe a small cut on

18 the bottom of his foot.  That's all to my knowledge, sir.

19 Q.  Okay.

20 A.  But again, I was not on site.

21 Q.  When you applied for the warrant, do you remember informing

22 the judge that there are two minor children in the house?

23 A.  Yes, sir.

24 Q.  Knowing my client's online autism advocacy presence, did you

25 know that she -- one of her children has autism?

1  A.  We had received information that there were some physical

2  and/or mental issues possibly with both children.  And I do

3  recall the possible autism for the son.

4          MR. LEWIS:  All right.  Thank you.  I have no more

5  questions, Your Honor.

6          THE COURT:  Any redirect?

7          MR. McGULL:  No, Your Honor.

8          THE COURT:  All right.  May the witness be excused?

9          MR. LEWIS:  Yes, Your Honor.

10         MR. McGULL:  Yes, Your Honor.

11         THE COURT:  All right.  Thank you, Special Agent Lane.

12  You may be excused.  Any further testimony, Mr. McGull, from the

13  United States?

14         MR. McGULL:  No, Judge.

15         THE COURT:  And do you want to -- Mr. Lewis, do you

16  intend to make argument or I'll give you an opportunity to

17  produce any evidence by way of witness or proffer.

18         MR. LEWIS:  I do have evidence.

19         THE COURT:  All right.  And then what I'll do is after

20  the presentation of evidence by defense counsel, then I'll

21  entertain argument by both sides.  So, if you're ready to

22  proceed, Mr. Lewis.

23         MR. LEWIS:  Thank you, Your Honor.  The defense calls

24  Omar Yasin to the stand.

25              OMAR YASIN, DEFENDANT'S WITNESS, SWORN

1        MR. LEWIS:  May it please the Court?

2        THE COURT:  You may proceed.

3        MR. LEWIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5   BY MR. LEWIS:

6   Q.  Good afternoon, Omar.

7   A.  Hi.

8   Q.  Could you please introduce yourself to the Court, your name?

9   A.  Omar Yasin.

10  Q.  How do you spell that last name?

11  A.  Y-A-S-I-N.

12  Q.  Okay.  Where do you currently live?

13  A.  12 Chisholm, Buffalo, Missouri.

14  Q.  Now, this is the same house that was served this warrant,

15  correct?

16  A.  Yes.

17  Q.  That we're talking about today?

18  A.  Yes.

19  Q.  Okay.  How long have you lived at that residence?

20  A.  Six months.  I'd say, six months.

21  Q.  Okay.  More importantly, how long have -- you live with the

22  defendant, your daughter, correct?

23  A.  Yes.

24  Q.  How long have you lived with her?

25  A.  Eight years.

1  Q.  Okay.  Why did you begin living with her?

2  A.  Because she got disabled and she needed help.

3  Q.  Okay.  Now, what kind of disability does she have?

4  A.  She have like a spinal problem in her back.

5  Q.  Now, I know that you're not a doctor.

6  A.  Yeah.

7  Q.  But are you the one who transports her to her medical care?

8  A.  Yeah, sometime, yeah.  Sometime she goes by herself.

9  Q.  Okay.

10 A.  Sometime I do.

11 Q.  How often does she receive medical care, do you know?

12 A.  At least every three months she go to the doctor.

13 Q.  All right.  Does she have to administer herself a catheter?

14 A.  Yes.

15 Q.  Is this because of her injury?

16 A.  Yes.

17 Q.  Do you know if your daughter has ever been outside the

18 country?

19 A.  No, she had never been.

20 Q.  Does she even own a passport?

21 A.  No, she does not own a passport.

22 Q.  Okay.  If she were to be released on bond, could she live at

23 this with you in Buffalo again?

24 A.  Yes.

25 Q.  Would you make sure that she could get to and from court?

1  A.  Yes.

2  Q.  Now, there were two minor children living in that house at

3  that time, weren't there?

4  A.  Yes.

5  Q.  Where are they currently living?

6  A.  I don't know right now.

7  Q.  Okay.

8  A.  I assume they in state custody.

9  Q.  Okay.  Why don't you know where?  I mean, you've helped --

10  you've lived with these children since 2007?

11  A.  Yes.

12  Q.  And no one told you where these children are?

13  A.  No.  The last time --

14  Q.  Has any --

15  A.  Last time I heard they was taking the boy to the hospital

16  because he got cuts on his feet.

17  Q.  Does anyone in your family outside of jail know where your

18  children are?

19  A.  No.

20  Q.  Where those children are, forgive me.

21  A.  No.

22  Q.  Are you aware of Samir -- I guess Samir is the 13-year-old,

23  correct?

24  A.  Yes.

25  Q.  He has autism?

1  A.  Yes.

2  Q.  Is he currently enrolled in school?

3  A.  No, he's home schooled.

4  Q.  Why is he home schooled?

5  A.  A lot of reasons.  One of them she did have a problem in the

6  school.

7  Q.  Based upon his autism or something else?

8  A.  No.  It's about 9/11.

9  Q.  Okay.  So, he was being bullied?

10 A.  Yes.

11 Q.  And who educates your grandson?

12 A.  My daughter.

13 Q.  Okay.  Teach him how to read and write?

14 A.  Yes.

15 Q.  All the school education?

16 A.  Yes.

17 Q.  Why do you think he walked through that glass cutting his

18 feet during the day of the arrest?

19 A.  Because they ordered him to come out.

20 Q.  Thank you.

21         MR. LEWIS:  I have no more questions, Your Honor.

22         THE COURT:  Any cross-examination?

23         MR. McGULL:  Just a few, Your Honor.

24                         CROSS-EXAMINATION

25 BY MR. McGULL:

1  Q.  Mr. Yasin, how you doing?

2  A.  Okay.

3  Q.  I'd like to ask you a few questions.  You say you lived with

4  your daughter for eight years, is that correct?

5  A.  Yes.

6  Q.  Okay.  And during those eight years you lived with your

7  daughter, was she employed any of those years?

8  A.  She was employed before she got hurt, yes.

9  Q.  Okay.  And after she got hurt you all lived together, is that

10 correct?

11 A.  Yes.

12 Q.  Okay.  And on February 18 you talked to the FBI, is that

13 correct?

14 A.  Yes.

15 Q.  And when you spoke with the FBI, did you tell them that your

16 daughter was on the computer all the time?

17 A.  No, I didn't say that.  They asked me if she was on the

18 computer, I said yeah.

19 Q.  Okay.  Okay.  She was on the computer.  Now, do you work?

20 A.  Yes.

21 Q.  Okay.  And are you able to monitor her whereabouts after you

22 go to work in the morning?

23 A.  No, I can't.

24       MR. McGULL:  All right.  All right.  That's all the

25 questions I have of the witness, Your Honor.

1          THE COURT:  All right.  Thank you.  Any redirect?

2          MR. LEWIS:  No, Your Honor.  Thank you.  This witness

3    can be excused.

4          THE COURT:  All right.  Thank you, Mr. Yasin.

5          THE WITNESS:  Thank you.

6          THE COURT:  You may be excused.

7          MR. LEWIS:  Defense rests the evidence, Your Honor.

8          THE COURT:  I'll entertain argument first from the

9    United States, then I'll hear from defense counsel.

10         MR. McGULL:  Sure, Your Honor.  The testimony of the

11   witnesses, as well as the criminal complaint, all indicate an

12   escalation of violent rhetoric.  This rhetoric by the defendant

13   calling for a Jihad against federal employees.  This contact and

14   this communication was explicit calling for others to be killed,

15   the subject of the Indictment itself.  And this was all done from

16   the defendant's Internet postings out there in the public.  She

17   stated -- as the witness stated today, anyone raiding me will be

18   shot on site, all indicate that there's a danger associated with

19   this individual, that there are no combinations of conditions

20   that would reasonably assure the safety of the community.  Even

21   the phone texts that took place where she was talking about

22   getting a "G" which we believe is a gun, that you can purchase a

23   gun from a flea market without no background checks.  This is an

24   extremely, extremely dangerous individual that should not be out

25   in the community.  And we concur with the recommendation of

1   Pretrial Services that no condition would reasonably ensure the

2   safety of the community.  And I would ask that this Court, based

3   upon not only the Grand Jury finding probable cause for the

4   Indictment, but also the recommendation of Pretrial Services, the

5   recommendation of the Government and the fact that her father

6   just testified he has no control over what he can do with her

7   when he goes to work.  So, I think, Your Honor, that pretrial

8   detention is appropriate this case and we ask that the Court

9   follow that.  Thank you.

10          THE COURT:  Thank you, Mr. McGull.  Mr. Lewis, I'll hear

11  from defense counsel now.

12          MR. LEWIS:  Your Honor, I do believe that my client is

13  not a flight risk to this Court nor does she pose a danger to the

14  community.  I believe that the alleged conduct that is listed in

15  the criminal complaint is not as strong as the Government wishes

16  it to be.  Because we look just right now at the Indictment.  And

17  of course I was making my arguments in the dark because I didn't

18  know exactly what she would be indicted with, but now that I have

19  the Indictment, I know that we're talking about this tweet on

20  August 24th of 2015.  This is the basis for this Indictment.  And

21  the Government loves to pull one phase out of there, "wanted to

22  kill."  But what they, for some reason, neglect to do is read the

23  whole tweet in context.  And I'm going to do that right now.

24  Apparently this a re-tweet.  Now, I'm not -- I'm not on Twitter,

25  so I'm -- but from what I'm gathering there are tweets which are

originally created by the registrant and then there are re-tweets which are shared by the person on Twitter. So, this is not even her words, but these are re-tweeted. And then this comment is made. This is how it reads. "Mujahid electric @ccybercaliphate. Wanted to kill, full name," and then they've taken out the actual name. Well, that phrase makes sense. That Mujahid electric @ccybercaliphate wanted to kill whoever this person is. Because if you take that phrase out and say, well, she re-tweeted this and wanted to kill. What does that mean, wanted to kill? I mean, it's not like she wanted them dead, or I'm going to kill. Wanted to kill is such an odd way of phrasing something. But if you read it in context, wait a minute. It's Mujahid electric @ccybercaliphate that wanted to kill these people. Now, when the officers went back out there in June of last year, she clearly told them that she sees herself as some sort of journalist broadcasting information that she finds online. The Supreme Court, thankfully, gave us a very strong decision last summer in *Elonis vs. United States*, in which a person wrote a rap song explicitly threatening his wife and co-workers and kindergarten classes, convicted of the exact same statute, and was overturned by the Supreme Court and the Supreme Court lists a very delicate balancing act between free speech and threats. And that case was much more explicit than what we have here. Because if we go through the window dressing of the complaint, we have, you know, some picture of President Obama running from a drone strike. And

1  of course, it's a -- it could either be a serious threat or it
2  could be an ironic commentary about the drone strikes and the
3  civilian casualties of such, or it could be just an ironic take
4  on *North by Northwest*, which I know the Court may not need to
5  point out, but Cary Grant survives that movie.  So, was that a
6  threat or just an ironic twist on a political statement?
7  Furthermore, there was a tweet about how putting Muslims in cages
8  angers the Muslim state and all this, and how this was something
9  that the Court should use to not only sign the complaint and sign
10  the warrant, but to detain her here today.  But isn't that
11  exactly what President Obama has been saying about Guantanamo,
12  that it is used a recruitment tool by ISIS, and therefore it
13  should be closed.  So, isn't that re-tweet the exact same
14  information that our Government is giving us?  Your Honor, the
15  Government says detain her because their evidence is so strong
16  and so overwhelming.  However, from what I'm seeing and from the
17  Indictment that I'm reading, it's actually very precarious and
18  there's going to be very lengthy discussions at my office about
19  First Amendment rights.  What is someone's personal beliefs
20  versus what is an actual threat?  Your Honor, when it comes down
21  to it, she is a disabled woman who poses no physical threat
22  herself and to anyone else.  I have presented those -- we have
23  presented the testimony of her father who can attest to her
24  medical issues.  Thankfully, I have a stack of medical files I'm
25  going to be going over, but a cursory review suggests nothing is

1   changed.  In my motion, I did mention to the Court her issues.

2   So, she poses no danger.  She has nowhere to go.  She no

3   passport.  Where is she fleeing?  She's not fleeing.  She's

4   almost a lifelong resident of southwest Missouri.  Now, the

5   Government makes a statement regarding her online presence.

6   That's as easy as unplugging something from a wall.  The Court

7   can, and has in the past in many cases that are much more serious

8   than a Class D felony, the Court has made the condition no

9   Internet access unless approved by the Probation Office.

10  Wouldn't that completely destroy her online presence and

11  therefore take away any issues regarding dangerousness?  So,

12  there are conditions this Court can meet, especially in light of

13  the fact that this is a Class D felony.  The maximum sentence is

14  five years.  This will take time to investigate and I need her

15  assistance to investigate the issues.  What is a tweet, what is a

16  re-tweet?  And, Your Honor, I would -- I need her assistance out

17  as opposed to in, especially with the time clock running

18  regarding a Class D felony.  Your Honor, I'd ask you to consider

19  this prior to rendering your decision.  Thank you.

20          THE COURT:  Thank you, Mr. Lewis.  Well, in reviewing

21  both the testimony presented here this afternoon, the Pretrial

22  Services Report, the affidavit in support of the criminal

23  complaint, you know, I do believe that defense counsel has

24  arguments which I think will obviously probably be revisited at a

25  later time.  You know, the issue before this Court is whether

1  there are any conditions or combination of conditions that I can
2  fashion that would reasonably assure the appearance of the
3  defendant as required and the safety of the community.  And I
4  don't intend -- I'm going to take the matter -- well, on the
5  issue of flight, you know, my initial reaction is that she's not
6  a flight risk now.  I only have to make that finding by a
7  preponderance of the evidence, and I note the actions by the
8  defendant at the time that she was arrested.  And so that portion
9  of the proceeding I am going to take under advisement as to
10  whether or not I make a finding that she's a flight risk.
11  However, I do intend to issue a written order in which I will
12  make a written finding by clear and convincing evidence that she
13  is a danger to the community.  I do note, you know, in regard to
14  the argument about taking Internet access away.  The complaint
15  seems to indicate that in June of 2015, the defendant was
16  interviewed by the FBI, and yet, the incidents giving rise to
17  this Indictment occur several months later.  So, even though she
18  was interviewed by the FBI in June of 2015, it does appear that
19  she continued to make these posts that, again, I know defense
20  counsel will make argument to -- how to construe the tweets and
21  re-tweets.  But it does appear to the Court that she is a danger
22  to the community, and I will note in my written order the reasons
23  for that.  But I'll take the issue of flight under advisement.  I
24  will reduce it to writing in the next few days.  Is there
25  anything further from either side?

1          MR. McGULL:  No, Your Honor.  Thank you.

2          MR. LEWIS:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  With that, we'll be in recess.

4   Thank you.

5                    (Court Adjourned at 3:44 p.m.)

1

2                                    **INDEX**

3

4   **WITNESSES FOR**
    **THE PLAINTIFF:**        **DIRECT**      **CROSS**        **REDIRECT**    **RECROSS**

5   Stacie Lane               3             17            20            21

6

7   **WITNESSES FOR**
    **THE DEFENDANT:**

8   Omar Yasin                23            27

9

10  **EXHIBITS:**        **MARKED**      **ADMITTED**

11  G#1              6             7
    G#2              8             8
12  G#3              9             9
    G#4              10            10
13  G#5              11            13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7          I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8    above-entitled matter.

9

          /s/ Lissa C. Whittaker          March 11, 2016
10         Signature of transcriber                 Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25